## Richmond.

### Todd v. Gallego Mills Manufacturing Co.

MARCH 8th, 1888.

1. JUDICIAL SALES— *Confirmation—Affidavits of undervalue— Upset bid.*—Whether a sale will be confirmed is a question not of arbitrary, but of sound legal discretion in view of all the circumstances to be exercised in the interest of fairness, prudence and due regard to the rights of all concerned. *Brock* v. *Rice*, 27 Gratt., 816; *Coles* v. *Coles*, 83 Va., 525. After-stated opinions, affidavits of undervalue, etc., are regarded as of but little value. But a substantial upset bid, well secured and safe, put in before confirmation, is as much a valid bid as if made at the auction, and cannot be disregarded.

2. IDEM—*Appeal—Refusal to suspend decree— When harmless error*—From refusal to confirm sale and order for re-sale, any party may appeal, and to refuse suspension of the decree is error, but this court will not reverse the decree for such error when it is right on its merits.

3. IDEM—*Case at bar.*—Total debts secured by trust deed on the Gallego Mills property amounted to $542,146 34. Assessed value of trust property was about $208,000. First and second liens aggregated $248,610 78. A portion of creditors representing the latter liens agreed with T. that he could have the property at $120,000, unless a higher bid came from another quarter. The property was knocked down to T. at that price. Before report of sale was acted upon by the court below, a well secured upset bid of ten per cent. was put in. · That court refused to confirm the sale, and ordered a re-sale.

HELD :

This was not error.

Appeal from decree of chancery court of city of Richmond, rendered May 28th, 1887, in two suits under the style of *Stokes & Allen* v. *The Gallego Mills Manufacturing Company*, and *The*

*Merchants and Mechanics Saving Bank* v. *The same,* which were heard together. The trust property decreed to be sold, was knocked off to Charles L. Todd at $120,000. Before the circuit court acted upon the report, J. R. Anderson put in an upset bid of $132,000. The court refused to confirm the sale, and directed a re-sale. From this decree Todd appealed to this court. Opinion states the case.

*R. G. Scott, E. Y. Cannon,* and *Meredith & Cocke,* for the appellant.

We ask that the lower court be reversed, because—

1st. To set aside such a sale was against public policy, which requires that the purchaser must be treated fairly, in order that judicial sales may be successful.

2d. The property was sold under most advantageous circumstances.

3d. On the day of sale it was regarded by all business men that the property brought a fair and adequate price.

4th. The property was bought at a sum which ninety-five per cent. of those really interested agreed to take for it.

5th. To set aside the sale was to assist this ninety-five per cent. class in working an injustice, of which they had promised not to be guilty.

6th. Because Mr. Todd was subjected to considerable trouble and expense.

Under such circumstances it would be only just for this court to order a confirmation—a thing that the lower court should have done.

*Guy & Gilliam* and *Pegram & Stringfellow,* for the appellees.

LACY, J., delivered the opinion of the court.

This suit was a creditors' bill to subject the property of the Gal-

lego Mills Manufacturing company to the payment of the debts of the company, an insolvent concern. The debts aggregating $542,146 34, while the assessed value of the real estate is reported as $205,835, without a lot known as the "Rutherford Mills Lot," lying outside the city of Richmond, in the county of Henrico, the assessed value of which is not stated, but which was knocked down by the auctioneer at the sale ordered by the court at the price of $2,470. The fixtures, machinery, and good will and furniture being stated at $21,857 26, together with debts, notes, open accounts, etc, aggregating the sum of $61,600 10; the total assets of the company, if all debts should be realized, amount to only $267,435 10. A sale was decreed by the court of all the real property of the company, and aggregated, when sold in separate lots, flour-mill, corn-mill, warehouse, the foundation walls for new mill, etc, the sum of $102,465 50. When offered as a whole, the same brought $120,000; this sale taking place April 20, 1887. On May 4th, following, an upset bid was filed with the court's commissioners, offering $132,000; and the brands having been sold on the 20th of April at $7,250, the same person offered $7,975 for the said brands, and filed satisfactory security to guaranty the said upset bids. The commissioners reported to the court that the appellant, Charles L. Todd had made the highest bid which could be obtained on the day of sale, but that subsequently General Joseph R. Anderson had filed an upset bid, which was also reported as stated above. The purchaser of the brands was reported as desirous of withdrawing his bid for reasons stated, and thereupon Charles L. Todd filed an upset bid for the brands. Charles L. Todd insisted on his rights as purchaser, to have the property at his bid, notwithstanding the upset bid of General Anderson, and much testimony was taken on both sides as to the value of the property, the circumstances of the sale, etc. The cause coming on to be heard upon the motion to confirm the sale to Todd, the chancery court declined to confirm the same to Todd, but ordered a re-

sale to be made, taking the upset bid of General Anderson as
a basis, and releasing Todd from his bid, and decreeing to
him his expenses in examining the title, etc.   Todd thereupon
moved for a suspending order, to enable him to apply for an
appeal to this court, without prejudice to his rights in the
mean time; but this motion the court overruled, and ordered
the sale to proceed under the court's decree without delay.
Whereupon, the record being quickly copied, an appeal was
allowed to this decree (which was rendered on the 28th day of
May, 1887) on the 7th of June, 1887, by one of the judges of
this court.   The appeal, however, was not made effectual by
*supersedeas* bond, so as to stop proceedings in the court below,
and it was intimated at the bar here that the re-sale had taken
place, and that Todd had again become the purchaser at a
higher price; but nothing of this appears in the record, and
we will consider the question as it appeared in the chancery
court when the appeal was allowed.

The question for us to consider and decide, then, is whether
the chancery court erred in refusing to confirm the sale to
Todd, and directing a resale on the basis of the upset bid; the
said upset bid being a substantial advance of 10 per cent., or
$12,000, on the real property alone.   That the course pursued
by the chancellor was the usual course, and was in accordance
with the unbroken line of authorities in this State, is or must
be conceded..   There is no case to be found, in this State cer-
tainly, where this practice has been overruled by this court.
The English practice, before the act known as "The sale of
Land by Auction Act," passed in 1867, (30 & 31 Vict. c. 48,
§ 7,) in making judicial sales, was to open the biddings, and to
allow a person to offer a larger price than the reported highest
bid, and upon such offer being made, and a proportionate de-
posit paid in, to direct a resale of the property; and this was
allowed upon an advance of price, even after confirmation of
the sale reported.   Ten per cent. upon small sums, and less
upon large sums, was considered a sufficient advance to open

the biddings. As is set forth by Lord Eldon in *Andrews* v. *Emerson*, 7 Ves., 420, and in *White* v. *Wilson*, 14 Ves., 151, and in *Brooks* v. *Snaith*, 3 Ves. & B., 144 he opened the biddings upon an advance of 5 per cent. As was said by Judge Moncure in *Effinger* v. *Ralston*, 21 Gratt., 437: "Such are some of the rules of the English practice on this subject; and the same practice and rules, substantially, exist in this State." In this State, whether the court will confirm a sale, depends in great measure upon the particular circumstances of each case. The court, in acting upon a report of sale, does not exercise an arbitrary, but a sound legal discretion, in view of all the circumstances. It is to be exercised in the interest of fairness, prudence, and with a due regard to the rights of all concerned. *Brock* v. *Rice*, 27 Gratt., 816; *Taylor* v. *Cooper*, 10 Leigh, 317; *Daniel* v. *Leitch*, 13 Gratt., 195; *Roudabush* v. *Miller*, 32 Gratt., 454; *Berlin* v. *Melhorn*, 75 Va., 639; *Hansucker* v. *Walker*, 76 Va., 755; *Langyher* v. *Patterson*, 77 Va., 470; *Effinger* v. *Kenney*, 79 Va., 553; *Terry* v. *Coles*, 80 Va., 695; *Coles* v. *Coles' Ex'or*, 83 Va., 525. After a judicial sale has been confirmed by the court, it will not be set aside, except for good cause shown; and the action of the court in setting aside a sale once confirmed upon any but the most substantial reasons, of which a higher bid has been held not to be one, has been held in this court to be error, for which the decree would be reversed. *Langyher* v. *Patterson, supra;* *Berlin* v. *Melhorn, supra*, but in that case the decision was grounded on special circumstances. But the case stands upon different principles where the application is to withhold confirmation. "A decree of confirmation is a judgment of the court, which determines the rights of the parties. Such a decree possesses the same force and effect of any other adjudication by a court of competent jurisdiction. But before confirmation the whole proceeding is *in fieri*, and under the control of the court. Until then the accepted bidder is not regarded as the purchaser. His contract is incomplete, and he acquires by his bid no independent right to have it

perfected." Judge Staples in *Brock* v. *Rice, supra; Terry* v. *Coles, supra.*

The foregoing principles are well settled, and I do not consider that they are at all denied or controverted here. While the English practice has not been so far adopted in some of the other States, it has been substantially so adopted here. The court selling to satisfy debts has always proceeded upon the principle that it was just to cause the property to bring as much as possible for the benefit of all concerned—the creditor, to the extent of his claim; the debtor, to the extinguishment of his liability so far as the property would go. A fair and just price alone could justify a court in disposing of property within its jurisdiction,—a fair and just price, all things considered; that is all the attendant circumstances having been duly regarded. It may be said that after full notice, an open sale fairly conducted, in the face of such competition as can be attracted, the highest bid which is made is a fair and just criterion of the value of the property at that time; and so, after-stated opinions, affidavits of undervalue, etc., are regarded with but little favor, and estimated as of light weight, in the presence of the fact established by the auction and its results. And if, in this case, the persons in attendance at the sale on the 20th of April, 1887, had presented no better evidence of undervalue than such opinions and affidavits, it is quite likely that the sale would have been confirmed to Todd at his bid of $120,000, and the matter would have ended there. But before the court had an opportunity to act, before the sale was reported to the court, another person offered a substantial advance of $12,000, which was satisfactorily secured. There was then before the court no question as to the inadequacy of price to be determined. One hundred and thirty-two thousand dollars was offered for the same property, under the same circumstances, and so far as the court was concerned, at the same time, for property which the purchaser claimed the right to buy and have conveyed to him at $120,000.

If this case is to be reversed in the interest of the appellant, and the decree of the chancery court of Richmond refusing confirmation at the price of $120,000, and directing a resale on the basis of $132,000 as a starting point, it must, as is conceded on all hands, be because of the special circumstances of this case. The circumstances relied on to maintain the claim of the appellant, Todd, to have the property conveyed to him at his bid of $120,000, which was the highest bid at the auction sale, are not controverted, and are substantially as follows: The appellant, Todd, was the lessee of the corn-mill, and, as a prospective bidder for this, was admitted to a conference held before the sale between the court's commissioners and some of the creditors; these being some of the creditors secured by the deed of December 22, 1873, amounting to $221,168 05, and constituting the second class of secured creditors. The first class being, however, small in amount, these are referred to in the record as the preferred creditors. To pay them in full, the property had to bring, not only the $221,108 05, but, in addition, $27,442 73, making $248,610 78. Of the class secured by this lien by the deed of December 22, 1873, the New Bedford Bank of Massachusetts was present, by cashier and attorney. Mr. Thomas Potts and Mr. Charles P. Stokes, one of the administrators of A. Y. Stokes' estate, were also present. The lien of the New Bedford bank was $96,970 60; Potts, Stokes & Co., $2,000 11; the estate of A. Y. Stokes held $64,634 69; and there are six legatees under the will. Todd urged a sale in parcels; the above-named creditors urged a sale of the property as a whole. The commissioners decided to offer it first in parcels, reserving the right to then offer it as a whole. This course was followed. In lots or parcels it brought in the aggregate $102,465 50. During the crying of the last but one parcel, Mr. Todd, "in a spirit of raillery, approached Mr. Clifford, the attorney for the Bank of Commerce, the New Bedford bank, and told him, ' To show his good faith, he ought to bid on them, [the three lots, constituting the last but one par-

cel offered.]' Mr. Clifford then said, 'Mr. Todd, why can't we arrange this matter between ourselves?' Mr. Todd said, promptly and frankly, that he was willing to join with them in the purchase of the flour-mill if they would let him have the corn-mill already knocked down to him at the price he had bid. Mr. Clifford said: 'No, no; we don't want any of it. We prefer now to meet our loss, wipe our hands of it,' etc. Mr. Todd then asked him what proposition he would make. Mr. Clifford reflected slightly, and said, if the property as a whole would bring $125,000, he would be willing to let it go. Mr. Todd declined this, but said to Mr. Clifford that if he and his associates of the first mortgage bondholders would agree to let it go at $120,000, unless there was a higher bid from some other quarter, and would not bid against him over that sum, he would agree to go to that limit. The first mortgage bondholders there present—the representative of the New Bedford bank, Mr. Potts, and Mr. Stokes, conferred together, and agreed that, so far as they were concerned, they would permit the property to be sold at $120,000, if no greater price could be obtained; and, if it should be knocked out to Todd at that price, they further agreed, at Mr. Todd's request, that they would unite in a petition to the court that the sale should be confirmed to him. In accordance with this agreement, Mr. Todd did run the property up to $120,000, and it was knocked down to him as a whole at that price." By a paper writing, bearing date the 23d of April following, the cashier of the New Bedford bank, Thomas Potts, Charles P. Stokes, and W. B. Brooks requested of the court confirmation of the sale, and, when Mr. Potts forwarded this paper to New Bedford for the cashier's signature, he wrote him as follows:

"Richmond, Va., April 23, 1887.

"Dear Sir:

"I inclose a paper which Mr. Todd desires us to sign, in accordance with our promise. I have left a blank space for your bank. No upset bid has been made as yet. If

any is made, the court will consider it, and this paper then would be of no service. Please return to me, so that I can hand to Mr. Todd."

Two numerously signed petitions in the record show that the third-class creditors, and the creditors holding the floating or unsecured debts, asked for confirmation to Mr. Todd at $120,000. These are dated May 6, 1887. On the 9th of May General Anderson perfected and filed his bid of $132,000, with security. Mr. Potts testifies in the cause, having been called as a witness by Mr. Todd, and claims that his agreement with Mr. Todd was as Mr. Todd says, "The first mortgage bond-holders would agree to let it go at $120,000, unless there was a higher bid from some other quarter, and would not bid beyond that sum, he agreeing to that limit." Mr. Stokes testified that he agreed, for himself only, that he would not be connected in any way with a combination formed by the creditors to bid against him (Todd) beyond $120,000; that he considers the price inadequate, and that he certainly does not recommend a confirmation, since $132,000 has been offered from another quarter; that he did not understand on the day of sale that he agreed to ask confirmation of the sale if more should be offered by some one else; that when he signed the paper, on the 23d of April, asking confirmation to Todd, he read the letter of Potts to the cashier of the New Bedford Bank, set out above, and signed it with that understanding—that is, that, if an upset bid should be offered, the paper should go for nothing.

The testimony of Mr. Todd, as well as that of Potts & Stokes, shows that while nothing was said about an upset bid on the 20th of April at the auction of the property, that the agreement, in substance and fact, was that the first mortgage bond-holders would let the property go at $120,000 to Mr. Todd, unless there was a higher bid from some other quarter—that is, that they would not combine together, nor with others, to bid more; and, unless there was a higher bid from some other quarter, they would ask for the confirmation of the sale. An

upset bid from General Anderson was a higher bid from some other quarter; and the note of Potts to Talman, cashier, shows that an upset bid was looked upon as a possibility, three days after the sale, and before General Anderson made his bid. The very terms of the agreement, as stated by Mr. Todd himself, are broad enough to cover an upset bid made before the court was called upon to act in the matter. And Mr. Potts and Mr. Stokes both assert that their understanding of the matter was that an upset bid from some other quarter would be considered by the court. While we do not mean to decide any question not in submission in this case upon the evidence before us, we think there is no ground whatever to assert that these gentlemen perpetrated any fraud on Mr. Todd, as was so earnestly claimed at bar, and that the court enabled them to do it. The court was no party to this agreement in any way, whatever it was. As the vendor, the court was bound, in justice to all, to consider the upset bid. Such bids are not unusual, but frequently occur, are recognized by the courts, and all others having concern with judicial sales, having often been the subject of judicial consideration. Mr. Todd doubtless knew their nature and opportunity about as well as Mr. Potts and Mr. Stokes, or even General Anderson, for it appears by this record that when he thought proper he could and did file and upset bid himself for the brands. He appears to have been under no obligation not to do it; neither was General Anderson. But if Mr. Todd wished Mr. Clifford and Mr. Potts and Mr. Stokes to do him the favor to promise to let him have the property at but little more than one-half of its assessed value upon a cash valuation for taxation, no matter how much more anybody else might offer to pay, why not propose that and get their assent? There are two answers to this: First, Messrs. Clifford, Potts, and Stokes could not be brought to that point; secondly, Mr. Todd himself would not have asked and would not have accepted such a concession at the hands of any person. But if such an agreement had been made

between these gentlemen then and there, and the property had gone higher at the auction, the agreement would have been a vain thing. Messrs. Clifford, Potts, and Stokes were not making a sale, nor were they attending a sale, of their own property simply. There are other rights to be considered besides theirs. This was all well known to these gentlemen, and so they did not agree that Mr. Todd was to have the property in any event at $120,000; but, according to the statement of them all, he was to have it at that if there was no higher bid from some other quarter—that is, these creditors who could buy it at that price, and by their purchase contract no debt except to themselves, agreed not to bid more than that for it, but, as far as they were concerned, to let it go at that. They did let it go at that. They have bid no more for it; but, there being a "higher bid from some other quarter," they claim to be under no obligations to insist on the court's selling the property for less to Mr. Todd or anybody else. But if they did, and if they were bound, as Mr. Todd claims, to ask for confirmation to him at $12,000 less than somebody else offers, they could not conclude the rights of other people against their consent.

Suppose it be conceded that the property can never bring more than enough to pay off the first and second liens, and that the scores of creditors of the third class and fourth class, who petition so earnestly for a confirmation at the lowest bid before the court, can never have any interest in the matter. We must remember that the first and second liens aggregate $248,610 78. If Charles P. Stokes represented only his own individual interest in his character as bidder or other transactions at this auction sale—and this he himself distinctly proves, and he is not contradicted—then the debt represented by them aggregated only $109,970 60, or about that sum; and this was less than half of the preferred liens. Upon what principle could the chancery court have refused a bid, made according to the established forms of law, of $132,000, and accept one of $120,000? If the court had done this, and the credi-

tors or the Gallego Mills Manufacturing company had appealed from such decree, this court must have reversed the decree, or have overruled all the cases in this State upon this subject. All the cases agree that the court must sell at the best price obtainable; and when a substantial upset bid, well secured and safe, for ten per cent. advance, is put in before confirmation, it is as much a valid bid as if made at the auction. This is the settled law of this court, and will doubtless so remain until the legislature shall provide by law, as has been done by the English parliament, that "the highest *bona fide* bidder at a sale by auction of land under an order of the court, provided he has bid a sum equal to or higher than the reserved price, if any, will be declared or allowed the purchaser," unless in a case of fraud or improper management of the sale, etc. But when there was a reserved price, as there doubtless would be under such a law, so great a sacrifice as this would be unlikely; for, as we have said, this property is assessed as to the realty (including the sale at auction offer for the Rutherford lot) at $208,305, to which $21,857 26 must be added for the machinery in the mills, and $120,000 is but little more than one-half of its assessed value upon a cash basis for taxation. But it is urged that at least 95 per cent. of the purchase price will go, and therefore the advance will in like manner go, to the parties who agreed with Todd. But how can this be determined to be so? Twelve thousand dollars more is offered, and the re-sale starts at that. The court could not know or determine beforehand how much more it would bring at the re-sale; and the only way to determine this was by the re-sale which the court ordered and decreed. But it is said General Anderson was at the auction sale. It is proved that he was present a part of the time while the sale of the separate parcels was going on, and was not present at the sale of the whole.

The error assigned as to the action of the court below in refusing a suspension of the decree, in order to allow the appellant to apply for an appeal, will be briefly considered. This

action of the court was plainly erroneous; it was directly in violation of the statute. Section 4, ch. 178, Code. The court says that it did not consider, under the decided cases, that the party had any right to an appeal; but this was a question which the chancery court had no authority to decide. It was a question to be determined in the appellate court only, and in such a case the right of appeal is undoubted. The discretion vested in the court ordering the sale is always subject to review in the appellate court. It is not an arbitrary discretion, but a judicial discretion, which must be exercised reasonably and justly; and any party who may think himself aggrieved by the decree against him may apply for an appeal to this court. But in this case no injury was caused to the appellant by this action of the chancery court; his appeal, nevertheless, having been promptly granted, and duly heard in this court. It is not such error, therefore, for which this court should reverse the decree of the court below, which is plainly right on the merits.

The decree of the chancery court appealed from, will therefore be affirmed.

HINTON, J., dissented.

DECREE AFFIRMED.